UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| OHIO SECURITY INSURANCE COMPANY, | CASE NO. C15-5698 BHS |
| Plaintiff, | **CORRECTED ORDER** |
| v. | ORDER GRANTING THE PARTIES' STIPULATED MOTION TO CONTINUE, RENOTING AND RESERVING RULING ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT, REQUESTING SUPPLEMENTAL BRIEFING, AND SETTING ORAL ARGUMENT |
| AXIS INSURANCE COMPANY, | |
| Defendant. | |

This matter comes before the Court on the cross-motions for summary judgment of Plaintiff Ohio Security Insurance Company ("Ohio Security") and Defendant Axis Insurance Company ("Axis"). Dkts. 19, 22. Also before the Court is the parties' stipulated motion to continue the scheduled trial and related dates. Dkt. 34. The Court has considered the pleadings filed in support of and in opposition to the cross-motions and the remainder of the file and reserves ruling on the cross-motions for the reasons stated herein. The Court also grants the stipulated motion for a continuance.

# I. PROCEDURAL AND FACTUAL BACKGROUND

This case concerns insurance coverage for a building located at 9625 32nd Ave. S., Lakewood, Washington, that is used to store ice. In May, 2011, Grosso Enterprises Tacoma, LLC ("Grosso") leased the building to Reddy Ice Corporation ("Reddy Ice") for a period of ten years. *See* Dkt. 21-1. On January 20, 2012, a snowstorm caused the building's roof to become overloaded and collapse. Thereafter, Reddy Ice tendered an insurance claim to Axis and Grosso tendered an insurance claim to Ohio Security. The Axis insurance policy, issued to Reddy Ice as the "Named Insured," covered a period from August 25, 2011, to August 25, 2012. Dkt. 21-2. The Ohio Security policy was issued to Grosso and covered a period from May 17, 2011, to May 17, 2012. Dkt. 20-1. Both insurance companies began investigating the loss after claims were tendered from the respective insureds.

In December 2012, Axis retroactively issued an endorsement to Grosso naming him as an additional insured under the Axis policy. Dkt. 21 at 2. The endorsement's effective date was August 25, 2011, and covered the same period as the Axis policy, ending on August 25, 2012. Dkt. 25 at 4.

In providing coverage for the damaged building, Ohio Security issued the following payments to Grosso:

> May 5, 2012........................$250,000
>
> June 6, 2012........................$551,743.87
>
> October 3, 2013 .................$71,838.81
>
> November 21, 2013 ...........$920,504.42

Dkt. 21-3.

On January 16, 2015, Ohio Security filed a complaint in Pierce County Superior Court, bringing a claim against Axis for equitable contribution. Dkt. 1-3 at 2. Ohio Security claims that it is entitled to equitable contribution from Axis on its payments to Grosso in order to rebuild the building that collapsed. Dkt. 1-2.

On January 28, 2015, Ohio Security caused the summons and complaint to be served on Edith Green, an employee of Axis, at Axis's registered address for service of process on file with the state's insurance commissioner. Dkt. 1-3 at 13–14. On August 25, 2015, Axis moved to dismiss on the grounds of insufficiency of service of process. *Id.* at 51–58. On August 28, 2015, Ohio Security again served the summons and complaint, this time on the insurance commissioner. *Id.* at 175–76.

On September 28, 2015, Axis removed, before the motion to dismiss was addressed by the Superior Court. Dkt. 1. On October 5, 2017, Axis filed its answer, raising the affirmative defenses of the statute of limitations. Dkt. 9.

On March 9, 2017, the parties filed their cross-motions for summary judgment and supporting declarations. Dkts. 19–25. On March 27, the parties filed their responses. Dkts. 26, 29. On March 31, 2017, the parties filed replies. Dkts. 30, 31. On April 25, 2017, the parties filed a stipulated motion to continue the trial and related dates. Dkt. 34.

## II.     DISCUSSION

**A.     Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any

material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The parties' disputes focus entirely on the construction of the Ohio Security and Axis insurance policies and the meaning of the lease agreement between Grosso and Reddy Ice. The interpretation of insurance policies and lease agreements is generally a question of law to be decided by the court. *Quadrant Corp. v. Am. States Ins. Co.*, 154 Wn.2d 165, 171 (2005); *Duvall Highlands LLC v. Elwell*, 104 Wn. App. 763, 771 n.18 (2001). However, where a material provision of a contract is ambiguous, "[d]etermining a contractual term's meaning involves a question of fact and examination of objective manifestations of the parties' intent." *Martinez v. Miller Indus., Inc.*, 94 Wn. App. 935, 943 (1999).

**B.      Equitable Contribution**

Ohio Security has advanced a single claim against Axis for equitable contribution. Axis argues that it is entitled to summary judgment on the basis that (1) the policies from Axis and Ohio Security do not cover the same loss, Dkt. 19 at 7–8; (2) Grosso never tendered a claim to Axis, *id.* at 9–10; and (3) Ohio Security's claim is barred by the statute of limitations, *id.* at 10–11. Ohio Security argues that it is entitled to summary judgment because the Axis and Ohio Security policies covered the same loss.

**1.      Same Loss**

"In the context of insurance law, contribution allows an insurer to recover from another insurer where both are independently obligated to indemnify or defend the same loss." *Wellman & Zuck, Inc. v. Hartford Fire Ins. Co.*, 170 Wn. App. 666, 679 (2012) (quoting *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 164 Wn.2d 411, 419 (2008)). For two policies to cover the same loss, the "polic[ies] must insure [1] the same property and [2] the same interest [3] against the same risk . . . ." *Kirkland v. Ohio Cas. Ins. Co.*, 18 Wn. App. 538, 545 (1977). Additionally, for the policies to cover the same loss, they must run to the same insured because "[e]quity provides no right for an insurer to seek contribution from another insurer who has no obligation to the insured." *Mut. of Enumclaw Ins. Co.*, 164 Wn.2d at 420. *See also Kirkland*, 18 Wn. App. at 547 ("The same interest would not be insured under the two policies if the vendor was the loss payee under one and the vendee or assignee the loss payee under the other.").

The Axis policy covers damage to real property. *See* Dkt. 24-1 at 17. Under its plain language, damage to "real property" would include structural damage such as the

collapsed roof in this case. However, coverage for real property damage under the Axis policy is limited to real property "in which the insured has an *insurable interest*." *Id.* (emphasis added). Therefore, the parties' dispute as to whether the Axis and Ohio Security policies covered the same loss depends upon (1) whether damage to the structure and its roof was an insurable interest under the Axis policy and (2) whether Grosso was an insured under both policies.

### a.      Reddy Ice's Insurable Interest Under the Axis Policy

Under Washington law, an "insurable interest" in property insurance "means any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage." RCW 48.18.040. Accordingly, because RCW 48.18.040 "permit[s] any legal or equitable interest to create an insurable interest," *Wolstein v. Yorkshire Ins. Co., Ltd.*, 97 Wn. App. 201, 207 (1999), Reddy Ice had an insurable interest to the extent that it was required under the lease agreement to obtain insurance. Indeed, it is a longstanding principle that "a tenant who has agreed . . . to keep the demised property insured is liable to the lessor for a breach of that agreement, and has an insurable interest in the property to the extent of the amount agreed to be insured." *Berry v. Am. Cent. Ins. Co. of St. Louis*, 132 N.Y. 49, 56–57 (1892). Accordingly, the Court will examine the lease agreement to ascertain the extent of Reddy Ice's insurable interest in the leased property.

"The touchstone of contract interpretation is the parties' intent." *Martinez v. Miller Indus., Inc.*, 94 Wn. App. 935, 942 (1999) (quoting *Tanner Electric Coop. v. Puget Sound Power & Light*, 128 Wash.2d 656, 674 (1996)). In determining the intent of Reddy Ice

and Grosso as it pertains to Reddy Ice's insurable interest, the Court considers the following:

> The intent of the parties in reducing an agreement to writing may be discovered from [1] the actual language of the agreement, as well as from [2] the contract as a whole, [3] the subject matter and objective of the contract, [4] all the circumstances surrounding the making of the contract, [5] the subsequent acts and conduct of the parties to the contract, and the [6] reasonableness of respective interpretations advocated by the parties.

*Martinez v. Miller Indus., Inc.*, 94 Wn. App. 935, 943 (1999).

Article 11 ("Insurance and Indemnification") of the lease agreement indicates that Reddy Ice is obligated to carry property damage insurance. Dkt. 21-1 at 14–15. Specifically, the agreement states:

> 11.01 <u>Tenant's Insurance Obligation</u>. Tenant Covenants and agrees that from and after taking possession of the Premises, Tenant will carry and maintain, at its sole cost and expense, the following types of insurance . . . :
> * * *
> (b) PROPERTY DAMAGE. Insurance covering all *improvements located on the Premises*, in an amount not less than one hundred percent (100%) of their full replacement value providing protection against any peril . . . . Except as otherwise specifically provided herein, any policy proceeds shall be used for the repair or replacement of the property damaged or destroyed.

Dkt. 21-1 at 14–15 (emphasis added). There is no provision that obligates Grosso to obtain any insurance. *See* Dkt. 21-1.

Unfortunately, the Court cannot determine Reddy Ice's insurance obligations under the lease from this provision alone. The above provision is ambiguous to the extent that it requires Reddy Ice to insure "improvements located on the Premises," as the term "improvements" is not defined in the lease agreement and could reasonably refer to the structure of the building or to further additions thereto (such as non-loadbearing walls,

electrical work, added plumbing, etc.). The meaning of the term "improvements" is

material in this case because it identifies Reddy Ice's insurance obligations and exposure

under the lease, thereby defining Reddy Ice's insurable interest as the named insured

under the Axis policy. Ultimately, in determining Reddy Ice's insurable interest in the

lease property, the crucial question is whether "improvements located on the Premises"

includes the entire building that was damaged.

On one hand, an argument in favor of coverage under the Axis policy arises in the

provisions of the lease that purport to create a "triple net lease." *See id.* at 9. The purpose

of a triple net lease is that "[i]t obligate[s] Lessee to pay taxes and assessments,

maintenance and repairs, *insurance premiums* and utilities; each *in accordance with*

*specific lease provisions*." *In re McSheridan*, 184 B.R. 91, 94 (B.A.P. 9th Cir. 1995),

*overruled on other grounds by In re El Toro Materials Co., Inc.*, 504 F.3d 978 (9th Cir.

2007) (emphasis added). Moreover, "[i]n a long-term net lease, the tenant has a virtually

complete obligation to repair." 49 Am. Jur. 2d Landlord and Tenant § 716 (citing *Fisher*

*Properties, Inc. v. Arden-Mayfair, Inc.*, 106 Wn. 2d 826 (1986)). Therefore, under a triple

net lease, especially one that is long term such as the lease here, the Court could readily

interpret "improvements located on the Premises" to include the structure.

However, the lease agreement here is clearly not a true triple net lease. As Axis

points out, the lease agreement required Grosso to maintain and repair any damage to the

building's basic structure, including the roof. *See* Dkt. 19 at 8. Indeed, under Article 10

("Maintenance and Repairs"), Grosso was required to "at its expense without

reimbursement or contribution by [Reddy Ice], keep, maintain, and replace, if necessary,

foundations, exterior walls, interior load bearing walls, and roofs, including roof membrane and covering, in good order, condition, and repair." *Id.* at 14. Aside from revealing that this is not a true triple net lease, these provisions cut against finding that that Reddy Ice had an insurable interest in the applicable loss because they place the burden of replacing the building's structure on Grosso as the lessor.

Article 10 could also be interpreted as addressing a general obligation to maintain and repair the building in the course of reasonable wear and tear or the building's regular depreciation. If so interpreted, it would not override an express provision that obligated Reddy Ice to obtain property damage insurance for that structure. Nor would the "Maintenance and Repair" obligations set out in Article 10 override the more specific provisions in Article 14 dealing with "Damage, Destruction, [and] Obligation to Rebuild" in case of casualty. However, Article 14 uses the same ambiguous term "improvements." Specifically, it states that "[i]f any portion of the Premises is damaged or destroyed by fire or other casualty," Reddy Ice bears the burden of repairing, restoring, rebuilding, or replacing "the damaged or destroyed improvements, fixtures or equipment." Dkt. 21-1 at 18. Grosso is required to reimburse Reddy Ice for the cost of such rebuilding, but only "to the extent and at the times the proceeds of the insurance are made available to [Grosso]." *Id.*[1] Therefore, the Court is left in the same predicament of determining what is meant by

_____

[1] Additionally, once the rebuild is complete, "[a]ny surplus of insurance proceeds over the cost of restoration . . . shall be promptly paid over to [Reddy Ice]." *Id.* If insurance proceeds are insufficient to pay the entire cost of rebuilding, then Reddy Ice has the right to terminate the lease with no further obligations. *Id.* Additionally, if the premises are damaged or destroyed by casualty during the final two years of the lease term, Reddy Ice "may elect not to rebuild and to terminate this Lease; provided that [Grosso] shall receive insurance proceeds in the full amount of the casualty loss." *Id.*

the term "improvements" in order to decipher whether Grosso and Reddy Ice intended

that Reddy Ice be responsible for insuring and covering any casualty loss to the building.

> In *Siegloch v. Iroquois Mining Co.*, 106 Wash. 632, 181 P. 51, 53,
> [the Washington Supreme Court] held that the term 'improvements' has a
> broader significance than the term 'fixtures.' . . . The term must mean
> improvements of the realty; that is to say, such things as are placed thereon
> by the way of betterments which are of a permanent nature and which add
> to the value of the property as real property. This would include buildings
> and structures of every kind, and also such machinery as was placed
> thereon of a permanent nature and which tended to increase the value of the
> property for the purposes for which it was used; in this instance those
> things of a permanent nature which tended to increase the value of the
> property as a mine. Much can pass thereunder which, strictly speaking,
> cannot be denominated fixtures . . . .

*Forman v. Columbia Theater Co.*, 20 Wn.2d 685, 691–92 (1944). Also, Black's law

dictionary defines improvement as follows: "An addition to property, usu. real estate,

whether permanent or not; esp., one that increases its value or utility or that enhances its

appearance. — Also termed land improvement. Cf. fixture; maintenance." *Improvement*,

Black's Law Dictionary (10th ed. 2014).

The Washington common law definition of "improvements" lends strong support

to the idea that the term would include the building in this case, as it is interpreted to

"include buildings and structures of every kind." *Forman*, 20 Wn.2d at 692. However,

even under this definition, it is unclear from the lease whether the parties intended the

term "improvements" to include the building, as it was part of the real property that

formed the "Premises" at the time of the lease. Another reasonable interpretation would

be that "improvements" can include structures and structural additions, but it does not

include structures that preexist the lease. This interpretation would be supported by the

facts that (1) "premises" is defined as the legal title description for the subject property, which would include the preexisting building, *see* Dkt. 24-1 at 98, 127; and (2) the lease agreement appears to distinguish between improvements and the premises, as it requires Reddy Ice to insure "improvements located on the Premises." Dkt. 21-1 at 15.

In light of the foregoing, the Court determines that there remains a genuine dispute of fact on whether Reddy Ice had an insurable interest in the loss of the building. The resolution of this issue will depend primarily on what evidence is presented at trial regarding the intent of Grosso and Reddy Ice in requiring that Reddy Ice insure the "improvements located on the Premises." How the term "improvements" is interpreted may also indicate that there were some damages to the building in which Reddy Ice had an insurable interest and for which Axis owes contribution, even if the term does not include the entirety of the building.

### b.    Grosso Was an Additional Insured

Axis also argues that Grosso was not an insured under the Axis policy at the time of loss because the endorsement that names him as an additional insured was not issued until December 2012. Dkt. 21 at 2. Ohio Security counters that the parties to the Axis policy always intended Grosso to be an additional insured under the original policy and that "this endorsement was supposed to be issued at inception." Dkt. 30 at 2.

Additionally, a review of the endorsement itself shows that this is not a genuine dispute of fact. The endorsement's effective date was August 25, 2011, the date when the applicable policy first went into effect. Dkt. 25 at 4. The fact that the endorsement covered the policy period of August 25, 2011 to August 25, 2012, but was not issued

until December 2012, shows that the parties to the policy intended that Grosso be included as an additional insured under the original policy. *See id.* If it was not intended as part of the original agreement, the endorsement would have no meaning or effect. This intent is also strongly supported by the facts that (1) no additional premium was charged for the endorsement, *see* Dkt. 21 at 2; (2) an email exchange between representatives from Reddy Ice and Axis discussed the need to issue the endorsement retroactively, *see* Dkt. 31 at 2; and (3) the policy itself states that endorsements are part of the original policy, Dkt. 21-2 at 45.

Ohio Security's position is also supported by the lease agreement between Reddy Ice and Grosso. In at least one instance, Axis has represented that, to the extent the parties dispute liability for the structure repair, "it is the lease not the policies that are controlling . . . ." Dkt. 25 at 6. The lease agreement requires that Reddy Ice obtain property damage insurance "covering all improvements located on the premises" and states that "Landlord [Grosso] and any mortgagee or beneficiary of Landlord shall be named as additional insureds (as their interests may appear), which policies shall be for the mutual and joint benefit and protection of Landlord, Tenant and any mortgagee or beneficiary of Landlord . . . ." Dkt. 24-1 at 106. It is a general principle that a tenant's broad exposure under a triple net lease "is partly mitigated by the insurance that the lessee is required to carry, *which will name the lessor as an additional insured* as well as direct loss payee." 5 Deborah A. Golden et al., *Successful Partnering Between Inside and Outside Counsel* § 76:18 (2017).

Axis also argues that Grosso cannot be an additional insured under the known loss doctrine because Grosso knew of its loss at the time the endorsement was issued. Dkt. 19 at 8–9. Under the known risk doctrine, "an insured cannot collect on an insurance claim for a loss that the insured subjectively knew would occur at the time the insurance was purchased." *Aluminum Co. of Am. v. Aetna Cas. & Sur. Co.*, 140 Wn.2d 517, 556 (2000). This argument fails. As stated above, the endorsement and the lease agreement show that Grosso was intended as an additional insured at the inception of the Axis policy, which was purchased prior to the loss. Therefore, the known risk doctrine does not apply to this case.

Under the governing lease agreement and the applicable endorsement, the Court concludes that Grosso was an additional insured to the Axis policy. The parties do not dispute that Grosso was an insured under the Ohio Security policy. Therefore the Ohio Security and Axis policies both covered the same insured.

### c.     Grosso's Insurable Interest

Because Grosso was an additional insured, a question arises whether the Axis policy covered Grosso's interest in the subject loss, regardless of whether Reddy Ice had an insurable interest in the building structure. The Axis policy states that it covers real property damage "in which the *insured* has an insurable interest." Dkt. 24-1 at 17 (emphasis added). Because Grosso was an additional insured, Ohio Security argues that this coverage includes all of Grosso's interest in the subject property as its title owner.

The Court disagrees and finds that Grosso's insurable interest under the Axis policy is coextensive with Reddy Ice's insurable interest under the lease agreement. To

find otherwise would lead to an absurd result. Although Grosso was an additional insured under the Axis policy, the lease agreement states that Grosso was to be included as such only "as [its] interests may appear" in the underlying policy. Dkt. 24-1 at 106. The Court will not read the inclusion of Grosso as an additional insured to mean that Axis insured more than the policy's named insured, Reddy Ice, was obligated to insure under its lease agreement with Grosso.

### 2. Selective Tender

Axis also argues that it is entitled to summary judgment under the "selective tender" rule because Grosso never tendered a claim to Axis related to its loss. Dkt. 19 at 9–10. Under the selective tender rule, "equitable contribution claim by one co-insurer against another cannot arise until after an insured has tendered a claim to the co-insurer from whom contribution is sought." *Axis Surplus Ins. Co. v. James River Ins. Co.*, 635 F. Supp. 2d 1214, 1220 (W.D. Wash. 2009) (citing *Mut. of Enumclaw Ins. Co.*, 164 Wn.2d at 421). *See also XL Specialty Ins. Co. v. Progressive Cas. Ins. Co.*, 411 Fed. Appx. 78, 81 (9th Cir. 2011) ("The rule states that for two insurers to have a common obligation the insured, or someone on the insured's behalf, must tender the defense of an action potentially within the policy coverage.") (internal quotation marks and brackets omitted). Ohio Security does not dispute that Grosso never tendered a claim to Axis. Instead, it argues that its action for equitable contribution should be allowed to proceed because the selective tender rule does not apply to first party insurers, or to the extent the rule does apply, it has been complied with or waived.

To support its argument, Ohio Security relies upon secondary authority to argue that, in the context of first party property insurers, actual notice is all that is required to trigger a right to contribution. Dkt. 26 at 3 (citing 15 Steven Plitt et al., *Couch on Ins.* § 218:20 (2005)). The treatise upon which Ohio Security relies states: "an insurer will not be held to the technical notice requirements contained in the second insurer's policy." 15 *Couch on Ins.* § 218:20. This principle pertains to an insured's breach of *technical* notice requirements, such as a requirement of written notice within 30 days. *See id.* (citing *Midwest Mut. Ins. Co. v. Indiana Ins. Co.*, 412 N.E.2d 84, 86 (Ind. Ct. App. 1980)). Indeed, such technical notice requirements are easily waived under the "late tender" rule. *Mut. of Enumclaw Ins. Co.*, 164 Wn.2d at 425 ("[T]he 'late tender' rule recognized in Washington provides that even where an insured fails to give an insurer timely notice of a claim, the insurer is not relieved of its obligation to perform on the policy unless it can show that the late notice actually and substantially prejudiced it."). However, the late tender rule does not apply in equitable contribution claims, *id.* at 423, and the authority upon which Ohio Security relies does not address situations such as this, where the insured has failed entirely to tender a claim to one of its insurers.

In this regard, the law is clear:

> [A]n insurer's right to contribution is the insurer's right alone. The insurer, acting merely for itself, and not under an assignment of the insured's rights, does not have the right to tender a claim to another insurer. The "late tender" rule, which allows an insured to tender at any time (subject to prejudice analysis) is of no help to an insurer, who never had the right to tender at all.

*Id.* at 423. Without any tender by Grosso, or someone on Grosso's behalf, Ohio Security's claim for equitable contribution must fail.

Unaddressed by the parties, however, is the complication that both Reddy Ice and Grosso were insureds under the Axis policy—Reddy Ice as the named insured and Grosso as an additional insured. It is evident from the record, and there is no dispute, that Reddy Ice tendered a claim to Axis for the occurrence that caused the loss. It is unclear to the Court whether Reddy Ice's tender as the named insured can also be construed as a tender on Grosso's behalf as an additional insured. Therefore, before the Court issues a ruling based on the issue of selective tender, it requests that the parties submit supplemental briefing on whether someone, such as Reddy Ice as the named insured, has tendered a claim to Axis on Grosso's behalf.

### 3.  Statute of Limitations

Finally, Axis argues it is entitled to partial summary judgment on the basis that Ohio Security failed to commence this action within the applicable statute of limitations. This argument is advanced under two theories: First, Axis argues that RCW 48.05.200 designates service through the state insurance commissioner as the exclusive form in which service of legal process can be had against authorized insurers. Second, if the form of service described in RCW 48.05.200 is not exclusive, Axis argues that Ohio Security failed to serve an appropriate agent within the statute of limitations. Under either theory, Ohio Security would not have commenced this action until it provided service through

the state insurance commissioner on August 28, 2015, after the statute of limitations had run on multiple payments made to Grosso, totaling $801,743.87. *See* Dkt. 20-3 at 9, 11.[2]

### a.    RCW 48.05.200 as an Exclusive Means of Service

Axis argues that under RCW 4.28.080(7)(a) and RCW 48.05.200(1), service against an authorized foreign insurer may only be had through service upon Washington State's Insurance Commissioner. Dkt. 19 at 10–11; Dkt. 32 at 11–12. These statutes state as follows:

> Service made in the modes provided in this section is personal service. The summons shall be served by delivering a copy thereof . . . [i]f against an authorized foreign or alien insurance company, as provided in RCW 48.05.200.

RCW 4.28.080(7)(a).

> Each authorized foreign or alien insurer must appoint the commissioner as its attorney to receive service of, and upon whom must be served, all legal process issued against it in this state upon causes of action arising within this state. Service upon the commissioner as attorney constitutes service upon the insurer. *Service of legal process against the insurer can be had only by service upon the commissioner* . . . .

RCW 48.05.200(1) (emphasis added). The specific steps whereby "legal process against a person is served on the commission" are set forth under RCW 48.02.200.

---

[2] The Court notes that Axis does not argue that the Court lacks personal jurisdiction. *See Allstate Ins. Co. v. Khani*, 75 Wn. App. 317, 324 (1994) ("Proper service of the summons and complaint is essential to invoke personal jurisdiction over a party."); *Prof'l Marine Co. v. Those Certain Underwriters at Lloyd's*, 118 Wn. App. 694, 703 (2003) ("A judgment is void when the court lacks jurisdiction over the parties or the subject matter or lacks the inherent power to enter the order involved."). Indeed, Axis eventually received service through the insurance commissioner, indisputably subjecting it to the Court's jurisdiction. Therefore, the sole purpose for which Axis argues that process must be served through the insurance commissioner is to prove that this action was not commenced until after the statute of limitations had run.

Ohio Security argues that Axis's argument "has been rejected by Washington appellate courts, which have held that service through the insurance commissioner's office is *not* strictly required." Dkt. 26 at 5–6. To support this argument, Ohio Security relies upon *Kiblen v. Mut. of Omaha Ins. Co.*, 42 Wn. App. 65, 66 (1985), and *Powell v. Sphere Drake Ins. P.L.C.*, 97 Wn. App. 890, 899–900 (1999), *as amended* (Sept. 10, 1999).

In *Kiblen*, the Court of Appeals for Division Three held that "service may be made upon a foreign or alien insurer either within the state through the service upon the Insurance Commissioner or directly upon the insurer by means of extraterritorial service." 42 Wn. App. at 68. To reach its conclusion that the method of service through the commissioner was not exclusive, that court noted that the general statutes for service for foreign corporations—RCW 4.28.180 and RCW 4.28.185—were enacted subsequent to RCW 4.28.080(7)(a) and RCW 48.05.200(1). *See id.* at 67. Therefore, because RCW 4.82.185 states that personal jurisdiction exists over any person "[c]ontracting to insure any person, property, or risk located within this state at the time of contracting," it concluded that the mandatory language in RCW 4.28.080(7) and RCW 48.05.200 "indicates at best a preference for service upon the Insurance Commissioner in order that he be apprised of an action against a foreign insurance company doing business in this state." *Id.* at 67–68. In *Powell*, the Court of Appeals for Division One also concluded "that RCW 4.28.080(7) cannot be read as the exclusive method for effecting service upon an alien insurer." 97 Wn. App. at 900. To reach its conclusion, that court relied upon the previous *Kiblen* decision and further noted that a party could comply with the

1   requirements of RCW 4.28.080(10) for service of process on a foreign corporation by

2   serving a designated domestic agent. *Id.*

3          Notwithstanding *Kiblen* and *Powell*, Ohio security's argument based on the plain

4   text of RCW 48.05.200(1) and other applicable statutes is compelling. By including a

5   provision describing procedures for service of process that directly addresses service

6   upon "authorized foreign or alien insurance compan[ies]," principles of statutory

7   interpretation strongly suggest that the form of service described therein is exclusive.

8   First and foremost, the language of RCW 48.05.200, incorporated by RCW 4.28.080(7),

9   expressly states that "[s]ervice of legal process against the insurer can be had only by

10  service upon the commissioner . . . ." RCW 48.05.200(1). "The first consideration in

11  determining the exclusivity of a statute is whether the statute contains an exclusivity

12  clause." *Potter v. Washington State Patrol*, 165 Wn.2d 67, 80 (2008). Second, the

13  provisions regarding service upon "authorized foreign or alien insurance compan[ies]"

14  are more specific than the statutes addressing service upon foreign persons and

15  corporations in general. "[W]here there is any conflict between a general and a specific

16  statute, covering a subject in a more minute and definite way, the specific statute will

17  prevail." *State ex rel. Phillips v. Washington State Liquor Control Bd.*, 59 Wn.2d 565,

18  567 (1962). *See also Gossage v. State*, 112 Wn. App. 412, 420 (2002) ("It is a basic rule

19  of statutory construction that when there is a conflict between a statutory provision that

20  treats a subject in a general way and another that treats the same subject in a specific way,

21  the specific statute will prevail."); *Simpson v. United States*, 435 U.S. 6, 15 (1978)

22  ("[O]ur result is supported by the principle that gives precedence to the terms of the more

specific statute where a general statute and a specific statute speak to the same concern, even if the general provision was enacted later."); *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 228–29 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling."). Although the Court must "construe related statutes harmoniously to bring about a unified statutory scheme that maintains the integrity of the respective statutes whenever possible," *Gossage*, 112 Wn. App. at 420, the holdings in *Kiblen* and *Powell*, which allow service of process on foreign insurers under the general out-of-state persons and foreign corporation service statutes, does not harmonize the relevant statutes. Instead, such a reading of the statutory scheme set forth in RCW 4.28 and RCW 48.05 disregards the obvious conflict created by the exclusivity provision of RCW 48.05.200 and favors the more general foreign persons and corporations provisions over the specific foreign insurers provisions.

Moreover, the *Kiblen* and *Powell* decisions fail to consider several important aspects of the applicable service statues. For instance, the *Kiblen* opinion failed to consider that personal service out of state is "valid only when an affidavit is made and filed to the effect that service cannot be made within the state." RCW 4.28.185. Therefore, to the extent that the decision relied on the language of RCW 4.28.180 (for service against out-of-state persons generally) and the language of RCW 4.28.185 (creating personal jurisdiction over out-of-state insurers), its decision overlooked the reality that such out-of-state service can never be valid against authorized insurers because service is *always* available in-state through the insurance commissioner. *See* RCW 48.05.200(1) ("Each authorized foreign or alien insurer must appoint the

1    commissioner as its attorney to receive service of, and upon whom must be served, all

2    legal process issued against it in this state upon causes of action arising within this

3    state."). Similarly, the *Powell* opinion relied upon the permissive language found in RCW

4    48.05.215(2) (1999 version) that stated, "service of legal process against such

5    unauthorized foreign or alien insurer may be made by service of duplicate copies of legal

6    process on the [state insurance] commissioner." 97 Wn. App. at 900 (quoting RCW

7    48.05.215(2) (1999)) (emphasis added in *Powell*). This language from RCW 48.05.215

8    (1999) referred specifically to *unauthorized* insurers, which indicates that the argument

9    before the *Powell* court was whether RCW 4.28.080(7) was the exclusive means for

10   validly serving any type of foreign or alien insurer, authorized or unauthorized.

11        Furthermore, despite the holdings of *Kiblen* and *Powell*, RCW 4.28.080(7) has

12   since been amended so that RCW 4.28.080(7)(a) relates specifically to *authorized* foreign

13   insurers while RCW 4.28.080(7)(b) relates separately to service upon *unauthorized*

14   foreign insurers. RCW 4.28.080(7); Laws of 2011, Ch. 47, § 1.[3] RCW 48.05.215(2) was

15   also amended in 2011 and it now employs mandatory language while incorporating the

16   method of service through the insurance commissioner set forth under RCW 48.02.200.

17   RCW 48.05.215; Laws of 2011, Ch. 47, § 6. ("In any action, suit, or proceeding instituted

---

[3] Axis also argues that changes to RCW 48.05.200(1) that were made in 2011 abrogated *Kiblen* and *Powell*. Dkt. 32 at 11 n.44 (citing Laws of 2011, Ch. 47, § 5). However, the changes cited by Axis were merely of form and modernization, changing terms such as "shall" to "must." Laws of 2011, Ch. 47, § 5. These are not material changes to the law that could result in abrogation. Additionally, Axis's assertion regarding the 2011 amendments followed by a quotation of the current RCW 48.05.200(1) with bolded and italicized text that was *not* changed in 2011 is highly misleading, if not deceptive. *See* Dkt. 32 at 11. Nonetheless, as explained above, there were material changes in 2011 to RCW 4.28.080 and RCW 48.05.215 that would have a direct impact on the statutory interpretation in *Powell*.

by or on behalf of an insured or beneficiary, service of legal process against an unauthorized foreign or alien insurer *must be accomplished and processed* in the manner prescribed under RCW 48.02.200.") (emphasis added). Therefore, the permissive statutory language that formed the basis for the *Powell* decision has since been amended to mandatory language, and "[a] change in legislative intent is presumed when a material change is made in a statute." *Darkenwald v. State, Employment Sec. Dep't*, 183 Wn.2d 237, 252 (2015) (internal quotationmarks and brackets omitted). *See also Alexander v. Highfill*, 18 Wn.2d 733, 740 (1943) ("[W]here a law is amended or revised and a material change is made in the wording or an important part eliminated, it is presumed that the legislature intended a change in the law.").

Finally, the Court's concern over the precedent set by *Kiblen* and *Powell* is addressed in the Washington Practice Series. Although this secondary authority recites the holding of *Powell*, stating that RCW 4.28.080(7) "does not provide the exclusive method for serving out-of-state insurers," it also notes the limited analysis of that decision. K. Tegland, 14 Wash. Prac., Civil Procedure § 8:11 n.3 (2d ed.). Specifically, the treatise states:

> The court in *Powell* did not discuss RCWA 48.05.200, which *does* purport to make the statutory procedure (service on the Insurance Commissioner) the exclusive procedure for serving what the statute calls a "foreign or alien insurer." In light of RCWA 48.05.200, the cautious practice is to comply with the statute when the statute is applicable.

*Id.* (emphasis in original).

When there is no controlling Washington Supreme Court precedent on issues of state law, the Court is bound to apply the law as it believes the Washington Supreme

Court would under the circumstances. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). "If there be no decision by [the state's highest] court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State." *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967). "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law *which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise*." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) (emphasis added). For the reasons described above, the Court is concerned that strong "data" exist for it to find that the Washington State Supreme Court would conclude that RCW 4.28.080(7) and RCW 48.05.200 designate service upon the insurance commissioner as the exclusive method for serving authorized foreign insurers, notwithstanding the appellate decisions of *Kiblen* and *Powell*.

However, another option is available to the Court. Rather than guessing whether the Washington State Supreme Court would overturn *Kiblen* and *Powell*, the Court may certify the question to the State's Supreme Court for review. Under Washington law:

> When in the opinion of any federal court before whom a proceeding is pending, it is necessary to ascertain the local law of this state in order to dispose of such proceeding and the local law has not been clearly determined, such federal court may certify to the supreme court for answer the question of local law involved and the supreme court shall render its opinion in answer thereto.

RCW 2.60.020. As noted by the United States Supreme Court, certification saves "time, energy, and resources and [perhaps most importantly] helps build a cooperative judicial federalism." *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974).

Therefore, before the Court issues a ruling based on the statute of limitations, the Court requests supplemental briefing on whether the Court should certify this issue for review by the Washington State Supreme Court.

### b.     Service of Process to Edith Green

If service through the insurance commissioner is not exclusive, Axis argues that the attempted service through Edith Green on January 28, 2015, was nonetheless ineffective. Dkt. 32 at 12–1. This argument is advanced under a theory that Edith Green is not a qualified "agent" capable of accepting service for a foreign corporation. *Id.* Service may be had under RCW 4.28.080(10) by delivering the summons, "[i]f against a foreign corporation . . . doing business within this state, to any agent, cashier or secretary thereof." RCW 4.28.080(10). Under this statute, "it is not necessary that express authority to receive or accept service of process shall have been conferred by the corporation on the person served. It is sufficient if authority to receive service may be reasonably and justly implied." *Hartley v. Am. Contract Bridge League*, 61 Wn. App. 600, 604 (1991) (quoting *Crose v. Volkswagenwerk Aktiengesellschaft*, 88 Wn.2d 50, 58 (1977)). Accordingly, the Court must consider whether "the surrounding facts" show that the person receiving service "occupied such a responsible representative status in relationship to [the defendant] to make it reasonably certain that it would turn over the process to those called upon to answer." *Crose*, 88 Wn.2d at 58. However, the Washington courts

have also stated that to constitute an "agent" capable of accepting service, an employee "must either be designated the official agent for service of process by the corporation . . ., or he must be in such a managerial position that he is a representative of the corporation." *Reiner v. Pittsburg Des Moines Corp.*, 101 Wn.2d 475, 477 (1984). In determining whether someone is authorized to receive service of process, "[i]t is sufficient if authority to receive service may be reasonably and justly implied." *Faucher v. Burlington N., Inc.*, 24 Wn. App. 711, 713 (1979).

The Court is reluctant to find that the service upon Edith Green would not constitute adequate service under RCW 4.28.080(10). There is no dispute that Edith was not specifically designated as an agent for service of process. *See* Dkt. 33-5 at 3. Nor do the parties dispute that, as an assistant underwriter, Edith lacked managerial authority. *Id.* However, Axis listed the address where Edith worked as its registered address and left the doors to the office locked. *Id.* Because Edith was located near the office's door, she was often the person responsible for responding to those who came to the door, and she accepted and signed for deliveries and packages on behalf of Axis—even though she was not specifically designated to do so. *Id.* Although Edith was not a representative agent of Axis, the fact that the office was locked to the public and any agents located at the registered address were inaccessible except through her, placed her in the same type of gatekeeping role that would normally be occupied by a secretary. By including secretaries in addition to authorized agents, RCW 4.28.080(10) appears to authorize service upon those who serve as the gatekeepers to the authorized agents. Additionally, it is clear that the Edith promptly turned over process to the proper individuals called upon

1 to answer, as counsel for Axis sent a letter to Ohio Security's counsel confirming its

2 representation in the case within two weeks. Dkt. 27 at 1.

3      Under the circumstances surrounding service, although it is a close call, it appears

4 that Edith Green's "authority to receive service may be reasonably and *justly* implied."

5 *Faucher,* 24 Wn. App. at 713 (emphasis added). Therefore, if the means of service was

6 not statutorily limited to service through the insurance commissioner as discussed above,

7 the Court finds that service was sufficient under RCW 4.28.080(10).

8 **C.    Remaining Issues, Supplemental Briefing, and Oral Argument**

9      Based on the foregoing, a triable issue of fact remains on whether Reddy Ice had

10 an insurable interest under the lease agreement in insuring against the roof collapse.

11 However, before this issue may proceed to trial, there are two potentially dispositive legal

12 issues that must be resolved by the Court: (1) whether Ohio Security's claims are barred

13 by the selective tender rule, and (2) whether the statute of limitations bars Ohio

14 Securities' claim as it pertains to payments made on May 22, 2012, and June 26, 2012.

15      As explained above, the Court requests additional briefing on these issues. The

16 Court will also schedule oral argument. At oral argument, the Court requests that the

17 parties first address the issue of the selective tender rule, as it is likely dispositive. If the

18 selective tender rule applies, the Court will not need to decide whether service of process

19 was effective only when served through the state insurance commissioner.

20      Also, the scheduled trial date in this matter is rapidly approaching. Because these

21 two remaining issues must be resolved before this case can proceed to trial, and one of

22 them may result in certification to the Washington State Supreme Court, the Court grants

the parties' stipulated motion to continue the trial date and related pretrial deadlines. Accordingly, the Court will renote the cross-motions for May 30, 2017.

## III.    ORDER

Therefore, the Court **RESERVES RULING** on the parties' cross-motions for summary judgment and hereby **ORDERS** as follows:

1.      The parties may submit simultaneous supplemental briefs on the issues set forth above, to be filed no later than May 19, 2017. The supplemental briefs shall not exceed 8 pages. The parties may also submit supplemental responses, to be filed no later than May 26, 2017. The supplemental responses shall not exceed 4 pages.

2.      The Clerk shall renote the parties' cross-motions for summary judgment (Dkts. 19, 22) for consideration on May 30, 2017.

3.      Oral argument on the remaining issues is scheduled for May 30, 2017 at 2:00 PM.

4.      The parties' stipulated motion (Dkt. 34) for a continuance is **GRANTED**, and the trial date and related dates are **STRICKEN**.

Dated this 3rd day of May, 2017.


_____
BENJAMIN H. SETTLE
United States District Judge